**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

MANSOOR SHAMS                                                                      PLAINTIFF

v.                                                     CIVIL ACTION NO. 4:22-CV-035-MPM-DAS

DELTA STATE UNIVERSITY and
WILLIAM N. LAFORGE                                                         DEFENDANTS

## <u>ORDER</u>

This cause comes before the court on the motion of defendant Delta State University ("DSU") for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Mansoor Shams has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is a rather unusual Title VII case,[1] inasmuch as it does not involve more familiar allegations of race or sex discrimination, but, rather, claims that plaintiff Shams was discriminated against on the basis of animosity on the part of Cetin Oguz, his former supervisor at DSU and an individual of Turkish descent, towards plaintiff based on his Iranian descent. While this court frankly had limited knowledge of the existence of any animosity between Turks and Iranians, plaintiff writes in his brief that:

> National identity in the Middle East is multifaceted. Turkey and Iran, for example, share a contentious border and not much else. They differ in language (Turkish, Farsi), race/ethnicity (Turk, Persian), and sectarian tradition (Sunni, Shia), all of it tied into centuries of belligerent warring empires (Ottoman Empire, Persian Empire). Just recently the two nations fought a "proxy war" in which each backed different groups in the decade-long civil war in Syria which attempted to oust Assad.

---

[1] This court notes that, in his complaint, plaintiff also asserted age discrimination claims under the ADEA, which he later abandoned in his summary judgment brief. [Plaintiff's brief at 17, fn 12].

1

[Plaintiff's brief at 1-2].

While plaintiff's allegations in this case may be somewhat atypical, this court believes that he does assert a coherent theory as to how his Iranian national origin at least contributed to his allegedly being harassed and forced out of his position as a tenure-track assistant professor of animation at Delta State. In so concluding, this court notes that, while it finds plaintiff's description of the tensions between Turks and Iranian to be interesting, this description falls short of constituting actual *proof* that Oguz himself acted on the basis of such nationalist sentiment in this case. For this reason, this court finds it significant that plaintiff is able to offer proof that Oguz not only sought to disfavor him in his work conditions and performance evaluations based on his Iranian heritage but that he specifically sought to replace him with a fellow Turk.

Specifically, plaintiff summarizes his claims in this case as follows:

Cetin Oguz is Turkish. He serves as Chair of the Art Department at Delta State. In Spring 2021, Oguz identified a fellow Turk he wanted to hire as Professor of Animation. The incumbent Professor of Animation, Mansoor Shams (Persian/Iranian), had recently made discrimination complaints to HR about other misconduct by Oguz. Oguz wanted Shams out to make way for his replacement, but Shams had a full year left on his contract. So the administration called Shams into a meeting, told him he was being nonrenewed, refused to let him leave or call a lawyer, and then lied to him about his rights to trick him into quitting early. This was unlawful, and Defendants' motion for summary judgment should be denied.

[Plaintiff's brief at 1]. In further describing how Oguz came to hire a fellow Turk to fill his position, plaintiff writes that:

Oguz first became aware of Korkut Akacik by watching his Instagram live stream. The exact date is unknown, but it was sometime in "about spring 2021 . . .when things were kind of unfolding with Shams." Oguz could tell that Akacik was Turkish. Oguz knew this because Akacik had a Turkish name. Oguz immediately thought that "he would be one of the candidates for applying for the position," if Shams left. Thus Oguz decided to reach out to Akacik. He sent a direct message to Akacik on Instagram and had a conversation with him. According to Akacik's testimony, Oguz told him about a possible job opportunity at Delta State during their first direct message conversation on Instagram. Later on, after Shams was gone, Oguz played an active role in ensuring that his fellow Turk would be hired. "We formed a… search committee… and the search committee

2

thought that Akacik was the top candidate… [we] offered the position to Akacik… I was at the search committee and also I was the chair."

[Plaintiff's brief at 8-9].

In his brief, plaintiff makes what this court regards as a rather strong statistical argument that Oguz's hiring of a fellow Turk is unlikely to have been coincidental, writing that:

> What sets this case apart from the usual race discrimination case in Mississippi is the rarity of the races at issue, and the unusual timing of events. The evidence here is therefore different than might be typical - and far stronger. Turks are not common in the United States, and even less common in Mississippi. The chances of hiring someone in America at random, and that person being a Sunni Turk born in Turkey, are less than 1 in 1,000, or 0.07%. Thus, to have occurred coincidentally - with Akacik's background playing no role at all - would be quite remarkable. The timing is equally remarkable. Oguz identified a fellow Turk he hoped to hire, likely sometime around May 1st or 2nd. See supra, n.7. On May 3rd, he induced his boss to set up a termination meeting with the Plaintiff. This timing is quite close, and can support an inference that identifying Akacik as a replacement played a role in the decision to terminate Shams. Just as this kind of close coincidence in time can support causation in a retaliation case, so too in a case where a rare racial preference occurs with this kind of timing, causation can be inferred.

[Plaintiff's brief at 21].

This court notes at this juncture that circumstantial claims of discrimination or retaliation, such as the ones in this case, are analyzed under the familiar *McDonnell Douglas* framework. Under that framework, the plaintiff has the initial burden to establish a prima facie case of discrimination – he must produce evidence that he (1) is a member of a protected class, (2) was qualified for the position that she held, (3) was subject to an adverse employment action, and (4) was replaced by someone outside of his protected class or treated less favorably than other similarity-situated employees who were not in his protected class. The *prima facie* case, once established, creates a presumption of discrimination and the burden then shifts to the [University] to articulate a legitimate, non-discriminatory reason for the adverse employment action. If the [University] is able to articulate a legitimate, nondiscriminatory reason for the termination, the burden shifts back to [Plaintiff] to demonstrate that the employer's proffered reason is a pretext

for discrimination.  *Harville v. City of Houston, Mississippi*, 945 F.3d 870, 874-75 (5th Cir. 2019) (internal quotations omitted)

It is thus apparent that, to survive summary judgment under the *McDonnell Douglas* standard, a plaintiff may rely upon *positive* proof which is circumstantially suggestive of discrimination or retaliation, but he may also rely upon *negative* proof which casts doubt upon the defendant's stated reasons for taking a particular adverse employment action.  Plaintiff offers both types of proof in this case, and this court believes that this makes his claims considerably stronger than if he merely relied upon one or the other.  With regard to plaintiff's positive circumstantial proof of discrimination,  this court regards the arguments quoted above as being quite coherent allegations of ethnic favoritism on the part of Oguz which tend to support a conclusion that he may have thought and acted in terms of a candidate's national origin in making employment recommendations to DSU.  This court believes that part of the basic plausibility of plaintiff's allegations lies in the fact that, on a human level, it is easy to understand how a member of a small ethnic minority might feel that it "would be fun to work with" another member of that minority, with whom he has common ties of culture, language and religion.  It is likewise easy to understand how members of such a small minority might feel a desire to "look out for each other" professionally.  While these may be understandable impulses on a human level, it would be no more lawful for Oguz to seek to force plaintiff out of his job even partly on the basis of such impulses, than it would be for a white supervisor to conclude that it "would be fun to work with another white person" and force out a black employee on that basis.

While this court thus regards plaintiff's allegations of ethnic favoritism as quite coherent ones, it acknowledges that defendant is able to offer its own proof in this regard, such as evidence

that plaintiff's job was first offered to an African-American candidate. Moreover, in contending that plaintiff was a poor professor, defendant argues that:

> During the 2020-2021 academic year, Plaintiff's students began to complain about his performance to Cetin Oguz, the Chair of the Art Department. After talking with students and Plaintiff, Mr. Oguz determined that Plaintiff did not provide sufficient course content or organization for his classes, that his communication with students was poor, and that he did not meet with students during scheduled class times. Plaintiff had a faculty evaluation meeting with Oguz on February 19, 2021, at which Oguz addressed these and other performance issues. Oguz also told Plaintiff he would be placed on a formal performance improvement plan ("PIP"). At the time, DSU policy required a PIP to be implemented when a faculty member was rated "needs improvement" or "unsatisfactory" in their evaluations. Plaintiff [received] marks of "needs improvement" in the categories of Service and Scholarship (each of which carried a twenty percent weight) and "unsatisfactory" in the area of teaching (which carried a sixty percent weight).

[Brief at 1-2 (record citations omitted].

While a jury may well find defendant's arguments quoted above to be persuasive, it should be emphasized that it relies heavily upon Oguz's declaration in making them. Obviously, Oguz's good faith and impartiality is very much questioned by plaintiff in this case, and this court must emphasize that, at the summary judgment stage, it is required to view the facts in the light most favorable to the non-moving party. That being the case, this court has quoted liberally from, and granted deference to, plaintiff's version of the facts of this case, even though it is well aware that defendant has a very different account of the relevant events. At the same time, this court would emphasize that it is entirely possible for a jury to agree with defendant that plaintiff was a less-than-stellar professor and yet still conclude that he would not have been forced out of his position but for his national origin or retaliation for his having made reports of discrimination.

This court notes that, while plaintiff concedes that his student evaluations were not strong, he maintains that they were improving and that he had done nothing to warrant being forced out in the manner which he alleges to have taken place in this case. Specifically, plaintiff writes in his brief that:

Shams' student evaluations in the Fall of his second year were better than they had been in his first year. His first year student evaluations had a score of 2.52, and in Fall 2020 student evaluations rose a full point, on a scale out of five. Faculty Eval. at 6 [Docket 35-4]. One might reasonably expect this to lead to a higher performance evaluation for Shams. It did not. In the performance appraisal, Oguz did not acknowledge this improvement. Instead, he relied largely on these student scores to actually decrease Shams' performance rating, from "Meets Expectations" to "Needs Improvement." On teaching specifically, these student scores were relied on to rate his teaching "Unsatisfactory," which brought his overall score down. Ms. Oguz characterized the student reviews as "negative and alarming." *Id.* at 14-15.

[Plaintiff's brief at 6].

In contending that his overall record did not warrant the treatment he received, plaintiff further notes that, for the first semester after he was hired in 2019, the DSU art department was led by Michael Stanley, who evaluated his performance as having "met expectations." [Brief at 3]. In her deposition as DSU representative, HR Director Lisa Giger conceded that Stanley had given plaintiff this evaluation, and she likewise acknowledged that Stanley never came to her with any complaints about plaintiff. [Giger depo. at 49-50]. In her deposition, Giger also conceded that after Oguz took over from Stanley as department head, plaintiff had come to her with complaints that he was being discriminated against by Oguz, although she testified that she could not recall "whether [she] discussed a specific kind of discrimination like national origin or race or age or anything like that." [Giger depo. at 68]. While thus professing limited recollection of the nature of the complaint of discrimination made to her by plaintiff, Giger did acknowledge that she felt that one of plaintiff's complaints had merit, namely that Oguz referred to him as "assistant professor," while referring to other professors on a similar track as "professor." [*Id.* at 66-67]. Giger testified that she spoke to Oguz about this practice and admonished him that "[w]ell, okay, then you need to correct that. Next time you don't need to -- you're going to address one one way, you need to address them all the same way." [Depo. at 70].

6

In the court's view, a jury might legitimately regard Giger's testimony as proof that 1) Oguz singled plaintiff out for treatment which DSU itself regarded as inappropriate and worthy of admonishment, and 2) after being confronted with plaintiff's accusation about him by Giger, Oguz had an additional motivation – unlawful retaliation – for wanting to see him leave DSU. Plaintiff does, in fact, assert a retaliation claim in this case, and this claim benefits from the fact that, while a "but for" causation standard applies in retaliation cases, many other aspects of the plaintiff's burden of proof are eased in this context. This court discusses these aspects in greater detail below.

In his meeting with Giger, plaintiff made other complaints against Oguz, including that he had treated him in a rude and disrespectful manner at a public event and that he had failed to provide him with the supplies he needed for his art classes. With regard to the latter allegation, plaintiff writes in his brief that:

> Shams requested course materials from Oguz and Delta State, including basic needs such as painting and drawing materials, as well as a computer with certain specifications, so that he could conduct his courses. Shams provided the exact details of the art supplies and the computer he needed. Yet Shams did not receive art supplies for two or three months. Shams asked Oguz what had happened with the supplies, to which Oguz said roughly "you know what?... They are not accessible…" Even when materials did come in for Shams, they did not actually provide the proper materials that Shams requested. Shams used these despite not being suitable for teaching his students. Shams only got the computer he requested late in the year. "I didn't have it even for a month." This happened despite the fact that it is routine for art department faculty - including Oguz - to be issued computers supplied by Delta State for their work. Shams had to teach all his courses from his personal computer as a result.

[Brief at 5-6 (record citations omitted)].

This court notes that plaintiff's retaliation claim in this case is asserted under the "opposition" clause of the retaliation statute, inasmuch as he asserts that he was retaliated against for having "opposed" Oguz's discrimination against him, by reporting it to Giger. In its briefing, defendant provides a highly selective discussion of Fifth Circuit precedent in this context, writing that:

While there is no dispute Mr. Oguz complained to Ms. Giger about Mr. Oguz, "the opposition clause does not require opposition alone; it requires opposition *of a practice made unlawful by Title VII.*" *EEOC v. Rite Way Serv.*, 819 F.3d 235, 240 (5th Cir. 2016). None of the allegations Plaintiff raised to Ms. Giger, even if true, would rise to the level of a violation of Title VII, the ADEA, or Section 1981. *See Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 827 (5th Cir. 2019) ("Title VII's anti-retaliation provisions do not protect employees from 'petty slights, minor annoyances, and simple lack of good manners.'") (*citing Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)). Plaintiff's retaliation claims fail because he did not engage in protected activity.

[Defendant's brief at 11].

Defendant thus cites the Fifth Circuit's decision in *EEOC v. Rite Way Serv.*, 819 F.3d 235, 240 (5th Cir. 2016) as standing for the proposition that "the opposition clause does not require opposition alone; it requires opposition *of a practice made unlawful by Title VII.*" This is a highly selective description of the Fifth Circuit's decision in that case, since the full holding by that court was as follows:

But the opposition clause does not require opposition alone; it requires opposition *of a practice made unlawful by Title VII. See* 42 U.S.C. § 2000e–3(a). We have addressed this statutory language before, in *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130 (5th Cir. Unit A Sept.1981), a case involving affirmative rather than solicited opposition.

*Payne* addressed whether this "practice made unlawful" language requires the employee to prove that the employment practice he complained of was unlawful, or whether it was enough that he reasonably believed the employment practice to be unlawful. *See* 654 F.2d at 1137. We determined that the latter position was consistent with the text of the opposition clause and better-suited "[t]o effectuate the policies of Title VII and avoid the chilling effect that would otherwise arise...." *See id.* at 1137–40.

We have since noted that *Payne*'s reasonable belief standard is "in tension with the plain text" of Section 704(a), "which appears to require that the employer's practice actually be unlawful." *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 401 n. 2 (5th Cir.2013). Nonetheless, *Payne* remains good law. It is also in line with the law of every other circuit court. 2 Lex K. Larson, Employment Discrimination § 34.03[2], at 34–40 (2d ed. 2015) (describing how every circuit has adopted an objective "reasonable belief" requirement; most also include a subjective "good faith" requirement). The Supreme Court has not taken a position on the reasonable belief standard. *See Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (stating that the Court has "no occasion to rule on the propriety" of the Ninth Circuit's interpretation that the opposition clause applies to "practices that the employee could

reasonably believe were unlawful" because "no one could reasonably believe that the incident [opposed in this case] violated Title VII").

*Rite Way*, 819 F.3d at 240.

Thus, far from constituting a strict holding that, to give rise to an actionable retaliation claim, any opposition must relate to conduct actually prohibited by Title VII, *Rite Way* makes it clear that it is sufficient that the employee "reasonably believed the employment practice to be unlawful." *Id.* In the court's view, it is entirely proper that the Fifth Circuit would have provided a plaintiff-friendly interpretation of the law in this context, since there are strong public policy considerations against firing or otherwise retaliating against an employee for simply making a good faith allegation of discrimination against a co-worker, even if it turns out that the conduct in question did not rise to the level of a violation of Title VII or other discrimination statutes. Indeed, a fundamental job responsibility of HR officials such as Giger is to receive and evaluate complaints of discrimination by employees, and it would clearly have a chilling effect if employees felt that they could be fired or otherwise retaliated against for doing nothing other than making a good faith complaint of discrimination to the HR official responsible for considering such complaints. Moreover, the fact that Giger herself conceded that she felt that one of plaintiff's complaints had factual merit supports a conclusion that plaintiff was acting in good faith by reporting his concerns about Oguz to her.

Moreover, while defendant has a legitimate jury argument that plaintiff's poor record as a professor would have justified the non-renewal of his contract regardless of any retaliation, this court believes that plaintiff has a potentially strong argument that the manner in which he was allegedly forced out of his position in this case betrayed an urgency to "get rid of him" which cannot be explained solely by any deficiencies in his work performance as a professor. In so

stating, this court notes that plaintiff describes the meeting which led to his resignation as a

highly hostile one, writing in his brief that:

> On May 3, 2021, [DSU Dean Ellen] Green sent Shams an email, asking him to come to her office the following day. This was unexpected for Shams, as Green had never asked Shams to come to her office before. Shams complied with the request, and so he came to Green's office for a meeting with her on May 4, 2021. When Shams arrived, it turned out that Giger, the head of HR, was also there. Then a few minutes later, Oguz arrived as well. After everyone had arrived, Green invited all three into the room and then locked the door. Shams was thus invited to a meeting by surprise where he faced the Dean of the university, the head of HR, and the Chair of his department.
>
> At this meeting, Green told Shams that Delta State was going to non-renew his contract. He was presented with two letters at this meeting: the first letter was a resignation letter written in Shams's name, and the second was a "Notice of Non-Renewal of Contract" letter from the university. Giger, the head of HR, explained to Shams "when his pay would end." Giger told him that there would be no difference in the pay that he would receive whether he chose either to sign the resignation letter or the non-renewal letter: she told him that "There is no difference in pay. He would receive his pay until the end of August 31, [2021] either one…". Giger was certain in her deposition: "I know I said that" he would lose his pay in August 2021, either way. However, as just discussed, this was false. Shams was under contract for the full 2021-2022 school year. DSU was contractually obligated to provide that final year of employment, through August 2022 - not 2021 - and thus an entire additional year of pay. This was admitted by Green and Giger at deposition.
>
> At the meeting, Shams asked to clarify what difference there would be if he signed one letter vs. the other: "tell me what is different if I sign this letter and if I sign this letter. And she didn't respond."
>
> Shams then asked if he could call someone for advice about what to do. Green said "no, you have no right to call anyone. Just sign one of these paper[s] and move on…". Green "made it clear that one letter would be issued at that meeting", and he was told that he had to pick one to sign. Shams asked if he could have time to consider the choice. He also asked if he could take the letters with him and consult with a lawyer. Green said no. The position of Delta State was that "you [Shams] don't have time to think about it. You don't get to take it with you and think about it." Shams perceived extraordinary hostility in the meeting. Shams remembers Green locking the door and repeatedly shaking the handle to make sure it was locked. Shams was confused and concerned by this. "I still don't know why she locked the… Why she's locking the door in some official environment?... What is secret?" Shams felt extreme hostility from the people in that room. "When the gun is behind my head, I should select one… I thought maybe they shoot me because the attitude I saw from them, it wasn't normal. Especially this lady, Green, she was totally out of [her] mind… if she had [a] gun, she w[ould] shoot me… They didn't threaten, but the way of interaction. The expression o[n] her face wasn't normal." The result was that Shams experienced extraordinary pressure, and "didn't know what is different exactly, and no one gave me any answer. I just signed this one [the resignation letter], honestly, for no reason. To get rid of these people and get rid of that – get out of that room. That was the only reason." Id. at 74:20-75:2.

[Plaintiff's Brief at 13-15 (record citations omitted)].

Clearly, much of plaintiff's account of the May 4, 2021 meeting is a quite subjective description of it, and a jury will, of course, not be required to believe his version of events at trial. Once again, however, this court is required to view the evidence in the light most favorable to plaintiff at this stage of the proceedings, and, that being the case, it is not in a position to simply proclaim that his description of the meeting is either false or misleading. Moreover, accepting plaintiff's description of the meeting as accurate, this court has some doubts whether there was anything in his record which would have made defendant so motivated to see him depart DSU then and there, rather than simply wait for the remaining time on his contract to expire. This court further believes that there are legitimate jury questions regarding the extent to which defendant's evident desire to see plaintiff depart were influenced by 1) Oguz's desire to replace plaintiff with his favored Turkish candidate and/or 2) his anger over plaintiff having made a complaint of discrimination. This court regards both of these as plausible "but for" causes of plaintiff's being forced out of his position, and it concludes that a jury should evaluate plaintiff's discrimination and retaliation claims in this regard.

This court notes that, while much of plaintiff's account of the meeting is, in fact, subjective, Giger's own deposition testimony suggests that she misrepresented to plaintiff what his legal options were, depending upon whether he exercised the resignation or non-renewal option offered to him. Specifically, Giger testified in her deposition that:

Q. But you told him he would lose his pay on August 2021, correct?
A. I'm assuming that I did. I know I said that. I don't have a copy of that letter. We shredded that letter so I would have to – I would have to reference that letter. But if that was the case, then, yes, he would have received his pay until August of '22.

[Giger depo. at 126]. It is unclear from this portion of her deposition whether Giger may have misunderstood the question from plaintiff's counsel, since she initially agreed with him that she told plaintiff that he would lose his pay in August 2021, but she later referenced him receiving his pay until August of 2022. Considered as a whole, however, Giger's testimony clearly supports a conclusion that she gave plaintiff materially false information regarding what his legal options were. In so concluding, this court notes that Giger testified she told plaintiff:

> Giger: It was his decision to make whether or not he wanted to issue the termination letter or if he wanted to be -- or accept the resignation letter. I explained his benefits to him, how they would -- how long they would last, when his pay would end and he would be eligible for Cobra insurance.
> Q: On his pay, what did you tell him the difference was, if any, between the two options?
> Giger: There is no difference in pay. He would receive his pay until the end of August 31, either one, if he was terminated or if he resigned.

[Giger Depo. at 124].

Giger thus clearly testified that she told plaintiff that he would receive the same pay regardless of whether he resigned or was terminated/not renewed. [2] This representation was false, however, as defendant concedes in its reply brief:

> Plaintiff is correct that IHL policy requires Delta State to give tenure-track faculty members notice of non-renewal by September 1 before the end of the then-current contract. It is also true that the May 4 meeting was well past that deadline for the 2020-2021 academic year. Thus, if Delta State non-renewed Plaintiff's contract on May 4, he would have been entitled to a terminal contract for the 2021-2022 academic year.

[Reply brief at 2-3]. Giger conceded as much in her deposition, testifying that:

> Q: Because this meeting is happening May 4, 2021, he is going to get a contract for the 2021/2022 school year and then he won't have one for the 2022/2023 school year; is that right?
> A. That's correct.
> Q. So if he adopts this option, he would be paid until August 2022, correct?

---

[2] With regard to her use of the word "terminate" instead of "not renew," Giger explained that "we use those words interchangeably. So we say, 'terminate,' 'not renew,' to us it means the same thing. It's just a matter of wording we choose." [Giger Depo. at 125].

A. That's correct.

[Giger depo. at 125].

Giger's deposition testimony thus makes clear that she gave plaintiff materially false information regarding what his legal options were, and this court can discern a very reasonable argument that this misrepresentation was calculated to encourage him to take the resignation option which he did, in fact, take. This court finds it unsurprising that plaintiff would have taken the resignation option, since most employees would rather, in effect, have several months of paid vacation than continue in a job in which they felt unwelcome and harassed. In reality, however, Giger conceded that, if plaintiff had accepted the termination/non-renewal option, he would have had the right to be paid until August 2022: a full additional year's salary from what he was actually paid upon his resignation in this case.

In its reply brief, defendant argues that any incorrect information provided by Giger at the meeting was cured by the draft non-renewal letter, writing that "[e]ven if the HR Director had verbally given Plaintiff incorrect information about how long he would be paid, he was given accurate information in writing." [Reply brief at 4]. In this vein, defendant argues that "[t]he draft non-renewal letter he was given at the May 4 meeting cited that same IHL policy and expressly told him he would be given a one-year terminal contract if he was non-renewed." [Reply brief at 3, citing Exhibit J]. This court has reviewed Exhibit J, and nothing in this short letter makes any representation to plaintiff regarding how long he would receive his salary if he resigned as opposed to being terminated/non-renewed. To the contrary, the letter merely states that:

Dear Mr. Shams,
Upon the recommendation of your supervisors and pursuant to the Institutions of Higher Learning Board of Trustees Policies and Bylaws, Section 403.0102, I am notifying you of the decision not to renew your contract with Delta State for the 2022-2023 academic year. The IHL policy states:

13

"*Notice of intention not to renew a tenure track faculty member shall be furnished in writing according to the following schedule ... not later than September 1 before the date of termination of a contract after two or more years of service in the institution.*"

Your terminal contract with Delta State University will be for the 2021-2022 academic year.

I wish you well in your future endeavors.

Sincerely,

Dr. Charles A. McAdams

Provost and Vice President for Academic Affairs

Thus, while the draft non-renewal letter (which, as discussed below, DSU specifically forbade plaintiff from submitting to an attorney for his review) did correctly inform plaintiff of the last year of his contract under statute, it made no representation to him regarding how long he would receive his salary if he resigned as opposed to being terminated/non-renewed. The only representation made to plaintiff in this regard came from Giger, and she herself made clear that she told him that he would receive the same salary under either option. It appears to be undisputed that this very important information was false.

In its reply brief, defendant accuses plaintiff of "cherry-picking" Giger's deposition testimony in this regard, and, in so arguing, it highlights the last sentence of Giger's deposition testimony, quoted above, that:

Q. But you told him he would lose his pay on August 2021, correct?
A. I'm assuming that I did. I know I said that. I don't have a copy of that letter. We shredded that letter so I would have to – I would have to reference that letter. But if that was the case, then, yes, he would have received his pay until August of '22.

[Reply brief at 4]. This court has already noted that this is arguably an internally inconsistent statement by Giger which can be interpreted in two different ways. However, even if this deposition passage were the only evidence of what Giger said at the May 4 meeting, then this court would still be required, at the summary judgment stage, to adopt the interpretation most favorable to plaintiff, as the non-moving party. Once again, however, this court can discern no ambiguity whatsoever in Giger's testimony that:

14

Giger: It was his decision to make whether or not he wanted to issue the termination letter or if he wanted to be -- or accept the resignation letter. I explained his benefits to him, how they would -- how long they would last, when his pay would end and he would be eligible for Cobra insurance.

Q: On his pay, what did you tell him the difference was, if any, between the two options?

Giger: There is no difference in pay. He would receive his pay until the end of August 31, either one, if he was terminated or if he resigned.

[Giger Depo. at 124]. This court notes that defendant makes no mention of this portion of Giger's deposition testimony in its reply brief, and it thus appears that it is itself engaged in cherry-picking in this regard.

It should be emphasized that DSU's basic version of the facts of this case is that "[p]laintiff was given the choice to voluntarily resign or to have his contract non-renewed for the 2021-2022 academic year. Plaintiff chose to resign." [Brief at 3]. Obviously, however, in order for plaintiff to have made a genuine *choice* in this regard, he would have to have been provided with accurate information regarding the consequences of each option. Giger's own testimony seems clear enough that she provided plaintiff with materially false information in this regard, and this fact necessarily influences this court's consideration of *all* the evidence in this case. Indeed, a *McDonnell Douglas* standard which places heavy emphasis upon the credibility of the defendant's stated non-discriminatory reasons for acting as it did will not easily withstand proof which casts serious doubt upon the honesty and good faith of the very same individuals who provided those reasons. This is particularly true considering the plaintiff-friendly factual review standard on summary judgment.

In the court's view, other parts of Giger's deposition testimony raise further questions regarding whether DSU was attempting to "pull a fast one" on plaintiff, most notably her concession that he specifically requested to consult a lawyer and was denied the right to do so. Specifically, Giger testified that:

15

Q. What did Mr. Shams say in response to what Dr. Green said and what you just testified that you said?
A. His response was he wanted to take the letter with him and consult with a lawyer.
Q. And what was the reactions to that?
A. Dr. Green told him that he had to make a decision there. It was just our normal practice. We do not allow people when we are not renewing contracts, to take their letters with them and get back with us on it.

[Giger Depo. at 126]. Without question, the providing of materially false information regarding plaintiff's legal options and the denial of his request to consult with an attorney lend an air of doubtfulness to the May 4 meeting which cannot help but give credibility to his allegations in this case.[3]

Giger's deposition testimony aside, this court must wonder why plaintiff (who, as a university professor, is presumably an intelligent person) would have chosen to simply give up a year's salary and do something which is, seemingly, strongly against his personal interests, but for a concerted effort by defendant to mislead and badger him into doing so. This court can discern no good answer to this question, and it accordingly concludes that there are clear jury issues regarding whether defendant, acting through its employees, engaged in a bad faith scheme to mislead plaintiff into resigning his position and thereby give up the year's salary to which he was entitled by law. This court further believes that, if jurors find that defendant did, in fact engage in such a bad faith scheme, that they would be entirely justified in concluding that the non-discriminatory and non-retaliatory reasons offered by some of the same individuals present at the May 4 meeting are pretextual and unworthy of credence.

---

[3] This court notes that, while both of the draft letters provided to plaintiff to choose from are exhibits in this case and thus clearly seem to have survived, it nevertheless finds it interesting that Giger testified that "[w]e shredded that letter so I would have to – I would have to reference that letter." [Depo. at 126]. This court believes that Giger's testimony in this regard may be worthy of further inquiry at trial, since any intent on the part of defendant's employees to shred the letters provided to plaintiff arguably lends an additional air of doubtfulness to the May 4 meeting.

As noted previously, defendant argues (incorrectly, in this court's view) that any false information provided by Giger was cured by the draft non-renewal letter, but this argument largely misses the point. In so stating, this court notes that this is not simply a breach of contract case, in which plaintiff is seeking to recover the year's salary to which he was entitled to law. Rather, this is primarily a Title VII discrimination and retaliation case, in which defendant's *motive* for taking various employment actions is crucial. That being the case, the question arises whether, by providing plaintiff with false information regarding his legal options, Giger made an honest mistake or whether she was instead engaged in a deliberate effort to mislead him. In the court's view, the fact that DSU specifically denied plaintiff's request to consult an attorney may cause jurors to lean towards the latter possibility. If jurors do, in fact, conclude that DSU was deliberately trying to mislead plaintiff, then this might very reasonably cause them to look with distrust upon its entire defense in this case.

In light of the foregoing, this court concludes that this case presents triable jury issues, both as to plaintiff's Title VII retaliation and discrimination claims. In so concluding, this court notes that Title VII retaliation claims merely require a showing that the treatment plaintiff received would have been regarded as "materially adverse" by a reasonable employee, *see Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 56 (2006), and the meeting described above certainly seems to qualify as such. This court notes that, in Title VII discrimination cases, the *en banc* Fifth Circuit presently seems poised to reconsider its long-standing requirement that a plaintiff demonstrate that he suffered an "ultimate employment" action, *see Hamilton v. Dallas Cnty.*, 50 F.4th 1216 (5th Cir. 2022)(granting rehearing *en banc*), but it is unclear to this court what changes, if any, the Fifth Circuit will make to the law in this context.

Regardless of what changes, if any, the Fifth Circuit makes to its precedent in *Hamilton*, this court has serious doubts that that court would find that the meeting described in plaintiff's and Giger's depositions was consistent with the requirements of Title VII, under any standard. Otherwise, this court believes that many unscrupulous employers would likely attempt to trick, cajole, or mislead an employee into resigning if they were able to do so with impunity under Title VII. In any event, this court finds it impossible to countenance tactics such as denying an employee's entirely reasonable request to obtain counsel in reviewing his legal options, and it does not believe that such conduct is worthy of a state institution.

This court further believes that the May 4 meeting assists plaintiff in making out his hostile work environment/harassment claims in this case. In so stating, this court acknowledges that Title VII precedent in this context provides a rather strict requirement that a plaintiff demonstrate that he suffered harassment which was so "severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment." *Jackson v. Honeywell Intern., Inc.,* 601 F. App'x 280, 287 (5th Cir. 2015). This court will make a final ruling at the directed verdict stage of trial on whether or not plaintiff has managed to establish jury issues regarding his Title VII hostile work environment claims, but it is inclined to conclude that the heavy-handed and seemingly bad-faith treatment which he received from Oguz and others at his resignation meeting assists him in arguing that he was treated in a similar manner throughout his time at DSU.

In his brief, plaintiff argues that he

suffered seven types of harassment: he had (i) been deprived of course materials, (ii) been yelled at repeatedly by Oguz, (iii) been addressed as "assistant professor" in faculty meetings unlike his colleagues, (iv) suffered the humiliation of Professor Oguz's interruptions in Professor Shams' introduction of a respected colleague in industry, (v) been told not to bring any more speakers, (vi) been told he was getting a very poor performance appraisal and (vii) been told he would be placed on a performance improvement plan.

18

[Brief at 32]. Plaintiff thus does not list the May 4 meeting as part of his formal harassment claims,[4] but this court believes that the nature of the meeting nevertheless gives greater force and credibility to the allegations of harassment which he does make.

This court is accordingly inclined to let a jury decide whether "severe or pervasive" harassment was present in this case, although it will, to reiterate, make a final ruling in this regard at the directed verdict stage of trial. Indeed, this court wishes to emphasize that *all* of its rulings and inclinations expressed in this order are subject to being modified or changed at the directed verdict and/or jury instruction stages of trial, since it is always possible that the evidence at trial will prove to be stronger or weaker than it presently anticipates based on the summary judgment evidence. This court has no doubt that this case presents at least *some* issues which will require consideration by a jury, however, and, when that is the case, its general approach is to err on the side of having the jury make too many, as opposed to too few, findings. There is a simple judicial economy reason supporting this approach, namely that it is far easier for this court or the Fifth Circuit to simply strike juror findings which are unsupported by the evidence, whereas correcting an erroneous failure to even submit issues to the jury requires an entirely new trial.

This court notes that plaintiff has filed a rather unconventional motion for partial summary judgment, in which he takes issue with numerous affirmative defenses raised by defendant in its answer. This court has rarely seen plaintiffs file such motions, and it believes that they are generally unnecessary. In so stating, this court notes that, in its experience, many civil defendants routinely include a laundry list of affirmative defenses out of an abundance of caution, often copied

---

[4] As far as this court can tell, nothing will prevent plaintiff from arguing at trial that the pressure and deception which he describes at the May 4 meeting was itself the culmination of the hostile work environment which he suffered. This frankly strikes this court as being a reasonable argument under the facts of this case, and it may have simply been an oversight that plaintiff did not make it in his summary judgment briefing.

and pasted from other cases. For this reason, this court generally does not pay a great deal of attention to affirmative defenses, unless and until it becomes clear that they will be an issue at trial.

In this case, this court sees only one issue raised by plaintiff which it believes should be addressed in this order, namely the parties' disagreement about whether defendant is able to assert the *Faragher/Ellerth* affirmative defense to hostile work environment liability in this case. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The *Faragher/Ellerth* defense allows an employer to claim immunity from vicarious liability for a supervisor's harassment if it establishes "(a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Watts v. Kroger Co.*, 170 F.3d 505, 509–10 (5th Cir.1999)).

For its part, this court has serious doubts whether *Faragher/Ellerth* applies at all in this case, in light of the U.S. Supreme Court's decision in *Vance v. Ball State University*, 570 U.S. 421 (2013). In *Vance*, the Supreme Court held that the *Faragher/Ellerth* standard only applies to "supervisors," which it defined as those who have the power to "hire, fire, demote, promote, transfer, or discipline" their victim. If the harassing employee is the victim's co-worker, rather than supervisor, then *Faragher/Ellerth* does not apply, and the employer may be held liable only if it was negligent in controlling working conditions. *Vance*, 133 S.Ct. at 2439. It is far from clear to this court that Oguz qualifies as a supervisor in this case, since while he had the power to make *recommendations* regarding hiring and firing decisions, the May 4 meeting and the draft non-renewal letter, quoted above, suggest that the actual power to make these employment decisions lay elsewhere.

20

Neither of the parties has briefed *Vance*'s applicability to this case, and it requests that they do so before trial. This court will consider that briefing in making a final ruling on this issue at trial, but, at this juncture, it is rather strongly inclined to conclude that triable jury issues will exist under either standard. In so stating, this court notes its belief that the May 4 meeting (among other evidence in this case) tends to establish jury issues regarding whether defendant acted reasonably to correct any hostile work environment under either the negligence co-worker standard or the *Faragher/Ellerth* supervisor standard. Still, this court wishes to instruct the jury based on the correct standard, and it would be assisted in doing so by additional briefing from the parties on this issue.

This court now turns to another issue which, it believes, it needs to raise on its own motion, namely the applicability of Eleventh Amendment immunity in this case. Plaintiff has asserted a state law breach of contract claim in this case, but it appears to this court that this claim is barred by Eleventh Amendment immunity. The Fifth Circuit has held that Eleventh Amendment immunity is a jurisdictional issue which a court may raise *sua sponte*. *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 333 n. 8 (5th Cir. 2002). Moreover, under well-settled Eleventh Amendment principles, plaintiffs are generally unable to recovery monetary damages against an "arm of the state" in federal court. In a 2015 decision, Judge Davidson found that DSU is, in fact, an "arm of the state" for Eleventh Amendment purposes, writing that:

> As its name implies, Delta State University is a state university in Mississippi and is managed and controlled by the Board of Trustees of State Institutions of Higher Learning. *See* Miss. Const. art. VIII, § 213A; Miss.Code Ann. § 25–65–5(a); *United States v. Fordice,* 505 U.S. 717, 721, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992); *Ayers v. Thompson,* 358 F.3d 356, 360 n. 3 (5th Cir.2004). Therefore, Delta State University is an arm of the State of Mississippi unless an exception applies. *See Jagnandan,* 538 F.2d at 1175. There are three possible exceptions to Eleventh Amendment immunity: (i) valid abrogation by Congress; (ii) waiver or consent to suit by the state; or (iii) the state's amenability to suit under the *Ex parte Young* doctrine.

*Hays v. LaForge*, 113 F. Supp. 3d 883, 891 (N.D. Miss. 2015). Moreover, in a 2014 decision which was later affirmed by the Fifth Circuit, Judge Davidson found that a breach of contract claim brought against Mississippi State University by one of its former professors was barred by Eleventh Amendment immunity. *See Yul Chu v. Mississippi State Univ*., 901 F. Supp. 2d 761, 774 (N.D. Miss. 2012), aff'd, 592 F. App'x 260 (5th Cir. 2014).

These rulings by Judge Davidson strike this court as being correct ones, and it is accordingly inclined to conclude that Eleventh Amendment immunity bars plaintiff's breach of contract claims against DSU in this case. In so stating, this court notes that Eleventh Amendment immunity clearly does not bar plaintiff's Title VII claims against DSU, since the U.S. Supreme Court has held that this statute overrides such immunity. *See Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976). Much like Judge Davidson in *Yul Chu*, however, this court is unaware of any reason why plaintiff's breach of contract claim against DSU would not be barred by Eleventh Amendment immunity, and it is therefore inclined to dismiss that claim without prejudice to it being asserted in state court. If either side wishes to persuade this court to do otherwise, then they may so argue in the trial briefing which it has previously requested on the *Vance v. Ball State* issues.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is denied, and plaintiff's motion for partial summary judgment is likewise denied.

This, the 10th day of July, 2023.

/s/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**

22